Josie JAIMES, et al., Plaintiffs,

v.

TOLEDO METROPOLITAN HOUSING AUTHORITY, et al., Defendants.

No. C74–68.

United States District Court,
N.D. Ohio, W.D.

June 6, 1989.

Jeanne Deimling Johns, A.B.L.E., Toledo, Ohio, for plaintiffs.

William Connelly and Kevin Joyce, Connelly, Soutar & Jackson, Toledo, Ohio, Andrea Newmark, Dept. of Justice, Civil Div., Anthony J. Ciccone, Jr., Trial Dept., Dept. of HUD, Washington, D.C., Charles Matuszynski, LMHA, and Patrick J. Foley, Asst. U.S. Atty., Toledo, Ohio, for defendants.

## OPINION AND ORDER

McQUADE, District Judge.

This case is before the court on remand from the Sixth Circuit for a specific finding on the extent, if any, of the United States Department of Housing and Urban Development's ["HUD"] liability. In deciding this issue, the court has considered the following briefs submitted by the parties: Plaintiffs' Memorandum on the Merits Establishing HUD's Liability for Racial Segregation of LMHA's Public Housing Projects, Brief of LMHA Defendants Regarding Liability of HUD Defendants, Federal Defendants' Memorandum with Respect to HUD's Liability, Reply Brief of LMHA Defendants Regarding Liability of HUD Defendants, and Plaintiffs' Reply to Federal Defendants' Memorandum Regarding HUD's Liability. The court concludes that HUD is liable for the plaintiffs' claims in this case, and that HUD is ordered to provide the relief set forth in the Memorandum and Order of December 10, 1985.

This class action was filed on February 15, 1974, in the name of all low-income minority persons residing in the Toledo metropolitan area who are unable to secure adequate housing in the Toledo metropolitan area without assistance from the Toledo [now Lucas] Metropolitan Housing Authority ["LMHA"]. The plaintiffs alleged violations of the fifth, thirteenth and fourteenth amendments; 42 U.S.C. §§ 1981, 1982 and 1983; Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d—2000d-4; Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631; and the Housing Act of 1937, 42 U.S.C. §§ 1437–1437j.

In an Opinion of May 12, 1983, by District Judge Don J. Young, the district court concluded that LMHA and HUD were responsible for intentional racial discrimination that resulted in segregation of public housing in Lucas County. The court accordingly enjoined LMHA and HUD from engaging in any activities that had the purpose or effect of denying equal housing opportunities. The court also ordered the defendants to prepare an affirmative action plan to correct past segregation. Finally, the court awarded compensatory and punitive damages to three of the four named plaintiffs.

In *Jaimes v. Toledo Metropolitan Housing Authority*, 758 F.2d 1086 (6th Cir.1985) (*Jaimes I*), the Sixth Circuit affirmed the trial court's finding that there had been impermissible internal segregation within LMHA housing projects. The Sixth Circuit, however, found that the plaintiffs lacked standing on their claims that the defendants prevented their obtaining fair housing opportunities in the suburbs. Therefore, the Sixth Circuit reversed and set aside that part of the order instructing the defendants to take steps to secure cooperation agreements with municipalities outside the City of Toledo in order to insure that public housing projects would be

constructed in those municipalities. The court set aside the awards of damages, and, without resolving the issue, expressed uncertainty about holding HUD and its officials liable for damages and other relief "absent a direct relationship being established with respect to demonstrated racially discriminatory conduct and motivation on its part, rather than its perceived inaction and/or refusal to disturb the *status quo.*" *Id.* at 1104.

A second appeal was heard by the Sixth Circuit in *Jaimes v. Lucas Metropolitan Housing Authority*, 833 F.2d 1203 (6th Cir. 1987) (*Jaimes II*), in which the court reviewed Judge Young's affirmative action plan. The Sixth Circuit again affirmed Judge Young's findings and conclusions regarding intentional discrimination and segregation in the housing projects. The court suggested amending the plan to provide for annual reviews of the racial composition of the housing projects and a procedure for terminating the plan. The court again declined to hold HUD liable without an explicit fact-based finding by the district court. The court, therefore, directed that this court decide the issue of HUD's liability, and suggested that the Eleventh Circuit's opinion in *Anderson v. City of Alpharetta*, 737 F.2d 1530 (11th Cir.1984), serve as guidance. Finally, the Sixth Circuit affirmed those portions of the affirmative action plan that are designed to remedy past discrimination, but refused to order enforcement of those portions of the plan requiring additional funding from HUD.

As defined by the Sixth Circuit in *Jaimes II*, the issues before this court in determining HUD's liability are: (1) "[whether] the information with which the Lucas Metropolitan Housing Authority provided [HUD], information regarding the Lucas Metropolitan Housing Authority's practices and the racial mix of projects, put the United States Department of Housing and Urban Development on notice of discriminatory conduct on the part of the Lucas Metropoli-

tan Housing Authority," *Jaimes II*, 833 F.2d at 1208; and, if so, (2) "for what is [HUD] liable in light of sovereign immunity." *Id.*

## I. HUD FUNDING OF LMHA'S PROGRAMS

LMHA programs funded by HUD are the primary sources of subsidized, low-income housing in Lucas County. At the time of trial, LMHA owned or managed approximately 3,700 housing units through three programs: public housing, Section 23 leased housing, and Section 8 existing housing. Fifty-three percent (53%) of all housing units were rented to minorities. Of that 53%, 82% of the units were located in Minority Concentrated areas.[1] Of the 605 housing units located in Black Impacted areas,[2] 98% were occupied by minorities.

LMHA housing units are divided into two broad categories: units for elderly persons and units for families. Seventy-three percent (73%) of all family units were occupied by minorities. Seventy-nine percent (79%) of the units occupied by minority families were located in Minority Concentrated areas.

### A. Public Housing Program

Through the public housing program, HUD provides funds pursuant to the Housing Act of 1937, 42 U.S.C. § 1437–1437j, to a public housing authority through an Annual Contributions Contract. HUD provides payment of debt service on the initial development costs, payment of operating subsidies, and payment of debt service on subsequent capital improvements. In order to receive funding, the housing authority must obtain HUD's approval for a project and submit to HUD's supervision of the housing authority's management of the project. LMHA operates 2,800 units under this program.

At the time of trial, LMHA administered 38 housing projects. The 1977 Occupancy

---

**1.** A "Minority Concentrated area" is a census tract that is either Black Impacted (*see infra* note 2) or has three times the percentage of hispanics living in the county.

**2.** A "Black Impacted area" is a census tract that has twice the percentage of blacks living in the county.

Report[3] delivered to HUD from LMHA revealed that 27 of the 38 projects were significantly out of racial balance. A family unit is out of racial balance when minority representation in the unit is over 85% or under 55% and white representation is over 45% or under 15%. An elderly unit is out of racial balance when minority representation is over 55% or under 25% and white representation is over 75% or below 45%.

In 1953, there were seven public housing projects that were, by law, segregated according to race in Toledo. The housing authority was ordered to abandon its policy of segregation and to move toward integration of all public housing under its control. *Vann v. Toledo Metropolitan Housing Authority*, 113 F.Supp. 210 (N.D.Ohio 1953).

Between 1953 and 1976, six projects were constructed with HUD funds. Four of these were projects for elderly persons, 90% of whom were white. All four of the projects were located in white neighborhoods. Two projects were intended for mixed elderly and family use. One was located in a Black Impacted area and 97% of its occupants were minorities.

Fourteen projects were constructed between 1968 and 1977, eight in Minority Concentrated areas, one in an area of black migration, and three in areas with a substantial number of black residents.

The plaintiffs argue that HUD's selection of sites for construction of housing projects from 1953 to 1978 was discriminatory, but the evidence does not support this argument. At the time of trial in 1978, HUD had funded twenty-seven housing projects, fourteen of which were located outside areas of minority concentration. Eight of the projects located in areas of minority concentration were "replacement housing," located in areas of minority concentration pursuant to urban renewal plans to improve slum areas of the city. Furthermore, two-thirds of all public housing and Section 8 construction and rehabilitation projects were located outside areas of minority concentration. HUD, in fact, dis-

approved sites located in areas of minority concentration. When such disapproval left no available sites, HUD requested that LMHA, the Fair Housing Center and Advocates for Basic Legal Equality form a committee to locate available sites. If HUD is liable for discrimination in the public housing program, it is not because HUD's site selections were discriminatory.

### B. Section 23 Leased Housing

At the time of trial, approximately 550 units were leased by LMHA with HUD funds under the Section 23 leased housing program. Fifty-three percent (53%) of all the Section 23 units were in areas of minority concentration; sixty-six (66%) percent of the Section 23 family units were in areas of minority concentration. Of all minority tenants living in Section 23 leased housing, 68.8% lived in Black Impacted areas and 80.8% lived in Minority Concentrated areas. Officials of LMHA testified at trial that one of the reasons that they were unable to obtain units outside Minority Concentrated or Black Impacted areas was that rents provided by HUD were too low.

### C. Section 8 Existing Housing

A participant in the Section 8 existing housing program receives a subsidy after obtaining living accommodations in the private sector, sometimes with the assistance of an LMHA referral. HUD subsidizes the difference between what a participant can afford to pay and what HUD determines to be a fair market rent for the unit.

The plaintiffs cite the findings of two HUD investigators who found segregation and discriminatory practices in the Section 8 program in Lucas County as evidence that HUD engaged in practices that had a discriminatory effect. These investigations, however, were conducted in 1982 and 1984, four and six years after the trial in this case. These investigations, therefore, cannot be used as a basis for showing that HUD engaged in discriminatory practices at the time of the trial in this case.

---

**3.** An Occupancy Report is an annual report prepared by LMHA and sent to HUD reflecting, among other things, the racial composition of housing projects operated by LMHA.

## II. ANALYSIS

■ Plaintiffs' claim is that HUD violated its statutory duties not to discriminate in federally funded programs and to provide fair housing. This court will initially consider whether HUD violated Title VI of the Civil Rights Act of 1964 or Title VIII of the Civil Rights Act of 1968, because if no liability is established under those titles, then liability may not attach under plaintiffs' other statutory causes of action.

Title VI of the Civil Rights Act of 1964 provides, in part:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

Title VIII of the Civil Rights Act of 1968 provides, in part:

It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

.    .    .    .    .

The Secretary of Housing and Urban Development shall—

.    .    .    .    .

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter.

42 U.S.C. §§ 3601, 3608(d)(5).

Plaintiff's constitutional claims are based on the same evidence as their statutory claims. However, the plaintiffs must show that HUD acted with a discriminatory purpose to hold HUD liable for violations of plaintiffs' constitutional rights, *Washington v. Davis*, 426 U.S. 229, 239–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976), whereas HUD may be liable for statutory violations without proof of discriminatory intent. *United States v. City of Parma*, 661 F.2d 562, 575–76 (6th Cir.1981). Because this court concludes that HUD was aware of the discriminatory effect of its practices or the practices of LMHA, liability is premised on HUD's violation of Title VI and Title VII, and the court will not consider HUD's liability for constitutional violations.

■ The court notes at the outset that it is reviewing HUD's policies under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ["APA"]. The APA provides that any person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, may bring an action to "set aside agency action ... not in accordance with law" or to "compel agency action unlawfully withheld," *id.* § 706. Review of HUD's policies is barred where "statutes preclude judicial review," or where "agency action is committed to agency discretion by law." *Id.* § 701(a). Neither bar, however, is applicable to this case: (1) there is no statutory provision precluding judicial review of HUD's policies, and (2) the Secretary's compliance with Title VIII is not discretionary: Title VIII states that the Secretary *"shall ... administer the programs and activities ... in a manner affirmatively to further"* the fair housing policies of Title VIII. 42 U.S.C. § 3608(d)(5) (emphasis added). *See NAACP v. Secretary of Housing and Urban Dev.*, 817 F.2d 149 (1st Cir.1987) (finding HUD's policies reviewable under the APA).

The scope of review is provided in 5 U.S.C. § 706:

[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aide agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

.    .    .    .    .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right....

Thus, the court will review the policies of HUD in light of the trial court's finding as affirmed by the Sixth Circuit that unlawful intentional discrimination occurred in the administration of HUD-funded public housing programs in Lucas County. Given the trial court's findings and conclusions as affirmed by the Sixth Circuit that intentional discrimination has resulted in the impermissible internal segregation of LMHA's housing projects and the fact that HUD was aware of the racial imbalance of the projects and the use of the three-refusal rule, applying the *Alpharetta* standard of liability leaves HUD with no means of avoiding liability.

According to *Anderson v. City of Alpharetta*, 737 F.2d 1530 (11th Cir.1984), HUD may be liable for failure to comply with its statutory obligations under Title VIII in two situations: first, where HUD has itself engaged in discriminatory practices (such as approving funds for a project without considering its racial effect on the surrounding area), and second, where HUD is aware of a grantee's discriminatory practices and has not made an effort to eliminate such practices by terminating federal financial assistance to the grantee. *Id.* at 1537.

Although *Alpharetta* is not squarely on all fours with the case *sub judice*, its reasoning is instructive. In *Alpharetta*, the plaintiffs alleged that HUD violated Title VIII when it failed to pressure county commissioners who deliberately blocked, for racially motivated reasons, attempts to construct low-income public housing in unincorporated areas of the county. The Eleventh Circuit emphasized that HUD has no affirmative duty to correct injustice wherever it exists. HUD itself has few weapons to employ against wrongdoers other than to " 'withhold funds or defer action in the name of desegregation.' " *Alpharetta*, 737 F.2d at 1535 (*quoting* 114 Cong.Rec. 2527–28 (1968)). *See also Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209–11, 93 S.Ct. 364, 366–68, 34 L.Ed.2d 415 (1972). The court rejected the argument that HUD is guilty of a violation of its statutory duty to work toward desegregation of housing when it is not funding a

local housing authority and it fails to act in the face of racial opposition to the construction of public housing.

*Alpharetta* was a case challenging HUD's inactivity; it was not a case "where the plaintiffs accused HUD of closing its eyes to the discriminatory practices of a grantee." *Id.* at 1533. The housing authority itself was not named as a defendant in *Alpharetta;* the issue before the court was whether HUD was liable for its own failure to act. Part of the reason that the court refused to hold HUD liable on the facts of the case was the realization that HUD can do nothing except exert "moral suasion" on local officials to comply with Title VIII when HUD is not currently funding a local agency. *Id.* at 1535. In the case *sub judice*, however, HUD is accused of more than inactivity or refusal to disturb the status quo. The plaintiffs allege that HUD is liable for the discrimination that occurred in the administration of public housing in Lucas County because HUD continued to provide funds to LMHA while aware of the discriminatory effects of LMHA's practices and failed to force LMHA to comply with the law.

Section 3608(d)(5) imposes an affirmative duty on the Secretary of HUD to work toward the goal of desegregation in public housing projects. *NAACP v. Secretary of HUD*, 817 F.2d at 154–55; *Alpharetta*, 737 F.2d at 1537; *Shannon v. Department of Housing & Urban Development*, 436 F.2d 809, 819 (3d Cir.1970). Various courts have offered their versions of the substantive content of this duty, *e.g., Shannon*, 436 F.2d at 819, 822; *Alpharetta* at 1537; *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1134 (2d Cir.1973), but at a minimum, HUD may not expend federal funds in a manner that promotes or fails to deter discrimination in public housing.

The evidence adduced in this case indicates that HUD was aware that some of the housing projects administered by LMHA were "out of racial balance." This fact ought to have alerted HUD that the goal of desegregating public housing in Lucas County was not being accomplished and to continue funding LMHA projects

under such circumstances was a violation of HUD's duty under Title VIII to promote fair housing opportunities. Because HUD took no action in response to the information it received regarding the racial imbalance of LMHA's projects, HUD was administering federal funds in a manner that violated its duty affirmatively to further the goal of desegregation of public housing.

HUD authorizes local housing authorities to use the "three refusal" policy in assigning eligible applicants to available housing units. Under the "three refusal" policy, a single waiting list includes all eligible applicants listed in chronological order of application date. Preferences are given to some applicants, however, such as displaced persons, handicapped persons, and persons living in substandard housing. When an applicant is first on the waiting list, he or she is offered a suitable unit in the project with the most vacancies at that time. The applicant may refuse two offers without stating any reasons, but if the applicant refuses a third offer without cause, he or she moves to last place on the waiting list. An applicant may refuse any number of units for good cause without suffering any consequences.

On its face, the "three refusal" policy is race neutral. The district court found, however, that the policy maintained segregation in the housing projects, and ordered that the policy be abandoned. This finding and order were affirmed by the Sixth Circuit. *Jaimes I,* 758 F.2d at 1108–09; *Jaimes II,* 833 F.2d at 1206. HUD asserts now that there was no evidence at the time that the "three refusal" policy was discriminatory. HUD also posits that the "three refusal" policy was not discriminatory, but was only less effective at achieving desegregation than a "one refusal" policy might have been.

The plaintiffs are not required to show a discriminatory intent behind the "three refusal" policy in order to prove a violation of Title VIII of the Civil Rights Act of 1968. It is enough that they show that the policy had a discriminatory effect. *See United States v. City of Parma,* 661 F.2d 562, 575–76 (6th Cir.1981); *Metropolitan Housing Development Corp. v. Village of Arlington,* 558 F.2d 1283, 1290–91 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978).

A practice that is race neutral on its face may produce two kinds of discriminatory effects: first, it may have a greater adverse effect on one racial group than another, *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 148–49 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978), and second, it may perpetuate existing patterns of segregation. *Village of Arlington,* 558 F.2d at 1290.

Both kinds of discriminatory effects were engendered by the "three refusal" policy. First, the trial court found, and the Sixth Circuit has affirmed, that the "three refusal" policy has maintained segregation in LMHA's housing projects. *Jaimes I,* 758 F.2d at 1108–09; *Jaimes II,* 833 F.2d at 1206. This alone is a sufficient discriminatory effect. Second, given that 65% of LMHA's waiting list are minority applicants and 70% of its family tenants are minorities, the "three refusal" rule also has a greater adverse effect on minorities than on whites.

There is some evidence, however, that several LMHA housing projects were becoming less segregated under the "three refusal" policy. Two formerly all white projects were, at the time of the trial, 58% black and 41% black. HUD was also aware that LMHA was making an effort to integrate its projects by using race conscious selection procedures for new projects, and the counseling of tenants.

HUD was certainly aware the LMHA used the "three refusal" policy because HUD offered it to LMHA as one of several methods of assigning applicants to available units. HUD argues that awareness of the practice does not constitute awareness of its discriminatory effects. HUD would have this court find liability only when HUD is apprised by way of complaint or investigation that LMHA's practices are having a discriminatory effect or when LMHA's practices are overtly discriminatory. *Cf. Clients' Council v. Pierce,* 711

F.2d 1406 (8th Cir.1983) (HUD liable for acquiescing in local housing authority practices such a dual system of processing and assigning tenants, overtly segregationist assignments, and refusal to name blacks to housing authority board). Because HUD was not aware of the discriminatory effects of the "three refusal" policy, so HUD argues, it should not be held liable for those effects. HUD argues that "[i]t would be unreasonable and unworkable ... to hold that HUD's awareness of overtly race neutral practices imposes a duty to cut off a housing authority's funding (thereby denying housing to needy persons)...." Federal Defendants' Memorandum with Respect to HUD's Liability at 23.

This court does not agree with HUD that it may be held liable only in instances where HUD is confronted with blatantly race-conscious conduct as in *Clients' Council* (racial steering, dual assignment system) and *Gautreaux v. Romney*, 448 F.2d 731 (7th Cir.1971) (quotas, pre-clearance procedure that included a racial veto in selecting housing sites). Such a rule is patently antithetical to the standards set forth in *Jaimes II* and *Alpharetta*, which hold that liability may be premised on HUD's awareness of the discriminatory effects of the practices of a grantee.

HUD is charged by Congress with the responsibility of administering public housing funds in a manner that promotes fair housing opportunities without discriminating on account of race. When HUD is alerted to overt discrimination, HUD agrees that it has a duty to force the local housing authority into compliance with the law. To confine HUD's liability to such narrow circumstances is, however, too niggard a view of HUD's mandate: HUD's duty extends further to situations where it is confronted with the discriminatory effects of the local housing authority's practices. Although HUD's only effective weapon to ensure compliance by the local housing authority may be cutting of assistance, that is certainly not the first step HUD should take to ensure compliance. Warnings and investigation may be appropriate steps to take before the decision is made to cut off funds and put the housing requirements of the needy into jeopardy.

The court in *NAACP v. Secretary of HUD*, 817 F.2d 149 (1st Cir.1987), rejected HUD's argument that HUD violates its obligation under Title VIII only when HUD itself engages in discriminatory conduct or when HUD funds a grantee who is engaged in such discriminatory conduct with the purpose of furthering the grantee's discrimination. Rather, the court concluded that HUD's statutory instruction "affirmatively to further" Title VIII's fair housing policy required more of HUD than to refrain from discrimination itself or intentionally encouraging discrimination by others. *Id.* at 154–56.

If HUD is properly fulfilling its duties, over time one would expect to find HUD's activity increasing the supply of open, integrated housing. In this case, however, one finds that segregation in housing continued and the supply of open, integrated housing did not increase. The plaintiffs have shown that HUD was aware of the discriminatory effects of practices on the part of LMHA, and HUD failed to force LMHA to comply with the law.

■ Having concluded that HUD is liable for the plaintiff's claims, the remaining issue is for what is HUD liable in light of sovereign immunity? In § 702 of the APA, Congress eliminated the defense of sovereign immunity in cases seeking relief other than money damages. *Bowen v. Massachusetts*, — U.S. —, 108 S.Ct. 2722, 2731, 101 L.Ed.2d 749 (1988). The Sixth Circuit held in *Jaimes II* that the relief ordered by the district court (that HUD provide funds for LMHA to hire eight additional staff people and that HUD and LMHA either pay the actual moving expenses at a rate not to exceed $200.00 per bedroom or provide free moving services for integrative transferees) was not in the nature of "damages," and could be paid out of funds in HUD's control rather than from general treasury funds. *Jaimes II*, 833 F.2d at 1209.

In light of *Bowen v. Massachusetts*, this court is convinced that the Sixth Circuit's characterization in *Jaimes II* of the relief

HUD has been ordered to supply under the plan is correct. The Court recognized that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen,* 108 S.Ct. at 2732. The relief ordered in this case is not compensatory relief intended as a substitute for a suffered loss. It is more in the nature of specific relief intended to compel compliance with the law. *See Maryland Dept. of Human Resources v. Dept. of Health & Human Services,* 763 F.2d 1441, 1446–47 (D.C.Cir.1985) (quoted with approval in *Bowen,* 108 S.Ct. at 2732–33) (arguing that an award of money is, in some circumstances, not an award of money damages).

It is therefore

ORDERED that HUD is liable for the plaintiffs' claims in this suit.

FURTHER ORDERED that HUD is to comply with the provisions in paragraphs III.E., IV.C., and IV.D. of the Memorandum and Order of December 10, 1985.