758 F.2d 1086
 53 USLW 2501
 Josie JAIMES, Tomas Gonzales, Clarence Turner, and Patricia
Davis, Plaintiffs- Appellees,
v.
TOLEDO METROPOLITAN HOUSING AUTHORITY; John Landry; Frank
B. Daig, Jr.; Dorothy Dennis; John Chadwell; Carlton
Siegel, Maurine Layson; United States Department of Housing
& Urban Development; Samuel R. Pierce, Secretary of HUD;
Alfred C. Moran, Administrator of HUD; Judith Y. Brachman,
Director of HUD, Columbus, Ohio, Defendants-Appellants.
 Nos. 83-3443, 83-3472 and 83-3561.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 29, 1984.
Decided March 25, 1985.
Rehearing Denied June 24, 1985.
 
 William M. Connelly (LEAD), Kevin E. Joyce (argued), Connelly, Soutar & Jackson; Charles A. Matuszynski, Toledo, Ohio, for Lucas Metropolitan Housing Authority.
 Anthony J. Steinmeyer, Michael Kemmel, Marc Johnston, Dept. of Justice, Civil Division, Washington, D.C., Patrick J. Foley, Asst. U.S. Atty., Toledo, Ohio, Edward G. Weil, Anthony J. Ciccone, Jr. (argued), Office of General Counsel, Dept. of Housing and Urban Development, Washington D.C., for HUD.
 Glen C. Galbreath (argued), Michael Warren, A.B.L.E., Inc., Joseph R. Tafelski, Toledo, Ohio, Janet E. LaBella, Bruce Gelber, National Committee Against Discrimination in Housing, Washington, D.C., for plaintiffs-appellees.
 Before LIVELY, Chief Judge, WELLFORD, Circuit Judge, and GIBBONS, District Judge.*
 WELLFORD, Circuit Judge.
 
 I.
 
 1
 This action was filed on February 15, 1974, with the plaintiffs, members of minority groups, alleging violations of the fifth, thirteenth and fourteenth amendments, the Civil Rights Act of 1870 (the "Civil Rights Act"), 42 U.S.C. Secs. 1981, 1982, and 1983, Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. Secs. 2000d-2000d-6, Title VIII of the Civil Rights Act of 1968 ("Title VIII"), 42 U.S.C. Secs. 3601-3631, and the Housing Act of 1937 (the "Housing Act"), as amended, 42 U.S.C. Secs. 1437-1437j. Basically, the allegations are that the Toledo Metropolitan Housing Authority, now the Lucas Metropolitan Housing Authority ("LMHA"), as owner and operator of some 3000 units of public housing, has engaged in past de jure segregation, has failed to adequately correct this past illegal conduct, and continues to countenance segregation in its public housing. More specifically, plaintiffs allege that LMHA not only has actively discriminated in the administration and operation of its existing housing, but has also made a concerted effort to place public housing in predominantly minority areas.
 
 
 2
 Plaintiffs are four low-income minority individuals. The district court certified them to represent a class of individuals including
 
 
 3
 all low-income minority persons residing in the Toledo metropolitan area who, by reason of their race and poverty are unable to secure decent, safe, and sanitary housing in the Toledo metropolitan area, at rents or prices they can afford without assistance from the Toledo [now Lucas] Metropolitan Housing Authority, and who would like to have the opportunity to live in public housing in suburban communities outside the City of Toledo.
 
 
 4
 This case was conditionally certified in April of 1975, at which time the United States Department of Housing and Urban Development ("HUD") was also joined as a defendant. The case was tried in January of 1978, and over five years later, on May 12, 1983, the district court rendered its opinion. The district court concluded that through the efforts of both LMHA and HUD, there existed intentional discrimination and segregation. The court therefore ordered injunctive and other equitable relief, and also awarded compensatory and punitive damages to three of the four named plaintiffs.
 
 II.
 
 5
 Lucas County encompasses four separate municipalities,[1] six separate villages,[2] and several townships. In 1970, the census reported 484,370 inhabitants of Lucas County. Of these, approximately 88 percent were white, 11 percent were black, and less than 1 percent were either of Mexican-American or some other origin.[3] According to the 1970 census report, approximately 97 percent of the black population and 86 percent of the Mexican-American population lived in the City of Toledo.[4] This is in contrast to the fact that in 1970, Toledo accounted for only about 79 percent of the Lucas County population.[5]
 
 
 6
 Lucas County, in 1970, was divided into 128 census tracts. Of these, 20 comprise what have been defined as "Black Impacted" areas, while 35 comprise "Minority Concentrated" areas.[6] Some 54 census tracts have either no blacks or less than a 1 percent non-white population residing in them. The majority of white residents in the county reside in these areas, while the overwhelming majority of Lucas County blacks live in Black Impacted areas.
 
 
 7
 Until 1953 LMHA exercised a de jure policy of segregation.[7] As a result, housing projects built during this time were specifically built with no objective to bring about desegregation of public housing. Of the first seven projects built, four were placed in that section of Toledo where most blacks lived, and three in the predominantly white section of Toledo. Whites lived in the white section, and blacks lived in those units in the black section. Following the advent of desegregation, however, projects were built in various other parts of the city. In the period from 1953 to 1967, six projects were constructed. Four were built specifically for the elderly, while two others accommodated both families and the elderly. Only one of these latter two units was placed in a neighborhood where there was a minority concentration. From 1968 to 1977 fourteen more projects were developed. Six of these were placed in Black Impacted areas.
 
 
 8
 Although blacks and hispanics make up a small percentage of the Lucas County population, they have tended to make up the majority of the tenants in the housing projects. Statistics reflect the fact that these minorities account for approximately 40 percent of LMHA's elderly tenants and approximately 70 percent of LMHA's family tenants. Minority applicants make up approximately 65 percent of the LMHA waiting list. In LMHA's 1977 Report on Occupancy sent to HUD, more than three quarters of the project components were reported to be "out of racial balance."[8] Several of the project components are occupied entirely or almost entirely by one race.
 
 
 9
 Housing projects are not the only types of housing assistance available in Lucas County. Also available is "Section 8 Existing Housing."[9] Pursuant to this program a tenant is subsidized after obtaining living accommodations on his own in the private sector. Basically, HUD subsidizes the difference between what a family can afford to pay, and what HUD determines to be a "Fair Market Rent" for the unit. The individual must locate the unit and must qualify for the program to receive the assistance. A different form of Sec-8 housing is "New Construction Housing." Under this program, HUD enters into a long-term contract with developers who develop units and subsequently lease them to Section 8 tenants. Though this type of program is available, LMHA has decided not to participate.
 
 
 10
 Plaintiffs charge that the above alleged segregative effects are the direct result of discriminatory practices and actions employed by both LMHA and HUD. They claim first that LMHA and HUD intentionally placed the housing projects discussed in minority areas of the City of Toledo and that this has prevented those seeking public housing from enjoying the benefits available to persons not forced to live in minority areas. Second, plaintiffs claim that through the use of a "three refusal" procedure,[10] LMHA has allowed prospective tenants to choose in which project they wish to live. This allegedly fosters segregation.
 
 
 11
 Both LMHA and HUD deny any intent to segregate public housing. Both claim that the three refusal rule allows flexibility and gives prospective tenants, both minority and white, a limited freedom to choose where they wish to live. Further, as to the contention that housing projects have been purposely placed in minority areas of the City of Toledo rather than in the suburbs, LMHA responds by pointing to the need in the city for adequate housing. LMHA claims that Toledo needs public housing more than any of the surrounding areas, and for that reason Toledo has been the focus of the housing projects. Furthermore, it is uncontroverted that to place projects in any particular suburb, LMHA must obtain a "cooperation agreement" from the local government involved.[11] Agreements for public housing projects have not been obtained from any of the suburban areas around Toledo and therefore LMHA has not been able to provide public housing in these areas.[12]
 
 
 12
 To support their position of intentional segregation within housing, and of intentional placement of housing in minority areas, plaintiffs make the following allegations: (1) ten of the twenty-seven projects are found in Minority Concentrated areas; (2) seven other projects were placed in so-called "highly suspect" areas, those adjacent to Minority Concentrated areas or those subject to minority migration; (3) three projects were built in areas immediately adjacent to Minority Concentrated areas, and were only completed following the institution of litigation; (4) LMHA's past actions demonstrate a policy to discourage obtaining cooperation agreements.[13]
 
 
 13
 As stated previously, the district court found intentional segregation on the parts of both LMHA and HUD. In part VI of its order the court enjoined the defendants from:
 
 
 14
 a. engaging, or continuing to engage, in any acts or practices which have the purpose or effect of denying equal housing opportunities because of poverty, race, color, religion, national origin, or sex;
 
 
 15
 b. expending any monies, selling any bonds, entering into any contracts, or taking any other steps to construct or lease low-income housing in any areas which are, or soon may be, racially impacted;
 
 
 16
 c. [ ] failing or refusing to take any and all steps necessary, appropriate, or desirable to secure cooperation agreements from each and every municipal corporation in Lucas County which does not presently have such an agreement;
 
 
 17
 d. [ ] failing or refusing to take all possible actions to ensure that family public housing units are constructed in each and all of the municipal corporations in Lucas County outside of the City of Toledo.
 
 
 18
 Further, in part IX of its opinion it ordered LMHA and HUD to prepare and submit within 60 days a comprehensive housing plan, along with an affirmative action plan to correct the past segregation. Also, consistent with paragraph d. of part VI of its order, the court in part VII directed that a plan be prepared for dispersal of subsidized low-income housing throughout Lucas County. Finally, the court awarded both compensatory and punitive damages to three of the named plaintiffs. (Josie Jaimes and Tomas Gonzales were awarded $7200 apiece in compensatory, and $14,400 apiece in punitive damages; Patricia Davis Tarrie was awarded $6000 in compensatory and $12,000 in punitive damages.)
 
 
 19
 Both LMHA and HUD appeal. They claim the court erred in finding intentional discrimination. Also, both argue that the court erred in the damage award.[14] Finally, both argue that the affirmative relief ordered by the court is too broad and should be limited even if plaintiffs are entitled to relief. Before reaching these substantive arguments, however, we must first address the jurisdiction of this court to hear this case. Specifically, we must decide whether plaintiffs have standing to invoke the jurisdiction of the federal courts.
 
 III.
 A. STANDING
 
 20
 Even if no party to this appeal has raised the issue of standing, this court can and must address the issue on its own motion.[15] O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Eagerton v. Valuations, Inc., 698 F.2d 1115 (11th Cir.1983). See C. Wright & A. Miller, Federal Practice and Procedure Sec. 1393 (1969). Before a federal court accepts jurisdiction, a "case or controversy" must be established within the meaning of Article III of the United States Constitution. Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); Young v. Klutznick, 652 F.2d 617 (6th Cir.1981), cert. denied sub nom. Young v. Baldrige, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982). In order to establish such a case or controversy, the named plaintiffs must be shown to have "standing." Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Jacobs v. Martin Sweets Co., 550 F.2d 364 (6th Cir.), cert. denied, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977).
 
 
 21
 Standing has its roots in the policy of limiting courts to their proper roles in a free and democratic society. Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Federal courts then decide only those disputes which are truly adversary, and refrain from making generalized decisions in abstract settings. As stated by the Supreme Court just recently:
 
 
 22
 the "case or controversy" requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded. The several doctrines that have grown up to elaborate that requirement are "founded in concern about the proper--and properly limited--role of the courts in a democratic society."
 
 
 23
 Allen v. Wright, --- U.S. ----, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, reh'g denied, --- U.S. ----, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984) (quoting Warth v. Seldin, 422 U.S. at 498, 95 S.Ct. at 2205).
 
 
 24
 Standing in the constitutional sense consists of a three-part analysis. First, a party must allege and prove a "distinct and palpable" injury. Gladstone Relators v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). Second, this injury must be shown to be causally related to the complained-of conduct. In other words, a "fairly traceable causal connection" must exist between the injury and the defendant's alleged conduct. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); Young v. Klutznick, 652 F.2d 617. Finally, assuming it is appropriate for the court to exercise its remedial powers, there must be a substantial probability that the claimed injuries will be redressed by taking the action sought by the claimants.[16] Simon, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); see generally Lugo v. Miller, 640 F.2d 823, 827 (6th Cir.1981).[17]
 
 
 25
 Each plaintiff must be analyzed in the context of each alleged violation in order to determine whether he or she personally has suffered some actual or threatened injury as a result of the alleged illegal or wrongful conduct. Gladstone Realtors, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66; Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343. In the present case, ther are four named plaintiffs who have been certified to represent a broad class of individuals. The class consists of those persons unable to obtain decent housing in Toledo, and who would like to live in public housing in the Toledo suburbs.
 
 
 26
 That a suit may be a class action, however, adds nothing to the question of standing for even named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."
 
 
 27
 Simon, 426 U.S. at 40 n. 20, 96 S.Ct. at 1925 n. 20 (quoting Warth v. Seldin, 422 U.S. at 502, 95 S.Ct. at 2207). See also HOPE, Inc. v. County of DuPage, Illinois, 738 F.2d 797 (7th Cir.1984) (en banc).
 
 
 28
 Josie Jaimes is a Mexican-American who, prior to the filing of this suit, resided with her six children in Sylvania, a suburb of Toledo located in Lucas County. She allegedly had lived in Sylvania for 19 years up until the time her house was condemned, forcing her to move to a racially concentrated area of Toledo. Jaimes alleges that she cannot afford clean, safe, sanitary housing without the aid of LMHA, and that she has applied for LMHA aid and remains on a waiting list. At trial, Jaimes testified that she had in fact applied for housing with LMHA, but was informed none existed in Sylvania. Also, Jaimes testified that she was not sure whether she remained on the LMHA waiting list because she had failed to contact that office in over two and one-half years. She did testify, however, that she went to LMHA a number of times seeking housing.
 
 
 29
 Tomas Gonzales occupies a similar position. He is a Mexican-American who had lived in Sylvania for twenty-two years prior to the time his home was condemned, forcing his move to Toledo. He claims he would liked to have continued living there, but could not do so without LMHA assistance. He applied for LMHA housing and, pursuant to LMHA practice, was placed on a waiting list. At trial, Gonzales testified that when he applied for housing he was informed none existed in Sylvania. Further, Gonzales testified concerning his continuing strong desire to live in Sylvania. Finally, Gonzales testified at trial concerning his present location in Toledo and stated that he would continue to live there if necessary to obtain public housing assistance.
 
 
 30
 Patricia Davis Tarrie, a black female, resides along with her children in an LMHA housing project in Toledo. She, too, expressed a desire to live in the Toledo suburbs, yet claimed a need for LMHA assistance. At trial, she testified that she had resided in LMHA housing for over 12 years, and during that time constantly sought larger living quarters outside her location in the inner city. Tarrie also testified that the apparent reason for her inability to move to a larger apartment within the LMHA system was the large number of applicants ahead of her on the LMHA waiting list.
 
 
 31
 Clarence Turner, a black male, is described as residing in LMHA public housing in a predominantly black neighborhood in Toledo. The complaint states that he works in Wood County, Ohio, and is forced to travel a long distance to work because of his inability to afford housing there. He would like to live in Maumee, Ohio, but cannot do so without LMHA assistance. Turner did not testify at trial.
 
 
 32
 Each plaintiff alleges that he or she "would like to live in decent, safe and sanitary housing" in the suburban areas of Toledo (Sylvania and Maumee are specified by three of the four), "but were unable to afford such housing without the assistance of ... [the] Housing Authority." Plaintiffs further assert that a "common question of law and fact is whether defendants' provision and location of public housing in the Toledo area has denied plaintiffs and their class their rights under the Constitution and laws of the United States."
 
 
 33
 Plaintiffs' first and major contention is that LMHA and HUD have restricted public housing to the City of Toledo, and thus they are being deprived the opportunity to live in public housing in the suburbs. With the exception of the alleged violations of Title VIII and of the Housing Act, the claims made here of racially discriminatory practices and actions are similar to those asserted in Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343, and County of DuPage, 738 F.2d 797. Plaintiffs in both those cases, as here, were individuals purporting to represent a larger class of minority persons with low incomes who were excluded from desired housing in suburban areas because of acts and practices of county and local governmental entities and officials.[18] The acts and practices challenged in Warth and in County of DuPage were claimed to be both discriminatory and exclusionary, and intended to bar low income minority persons from adequate affordable housing in the suburban areas in controversy.[19]
 
 
 34
 In Warth the Supreme Court held that the individual plaintiffs lacked standing to make the constitutional and statutory challenge therein asserted. In coming to this conclusion, the Court accepted as true factual allegations by the plaintiffs that zoning and other actions of Penfield and its agencies and officials "had the effect of excluding persons of minority racial and ethnic groups," 422 U.S. at 496, 95 S.Ct. at 2204, and that Penfield's practices "had prevented them [black and Puerto Rican plaintiffs and others] from acquiring ... residential property in the town, and thus had forced them and their families to reside in less attractive environments." Id.[20]
 
 
 35
 In County of DuPage, 738 F.2d at 799, the plaintiffs charged the County, members of the County Board, and others, with " 'exclusionary housing practices' which effectively denied adequate housing to racial minorities and persons with low or moderate incomes," and with "a conspiracy to perpetuate the County's discriminatory housing practices." (Footnote omitted). The district court found that taking these allegations as true "absent the alleged discriminatory housing practices of the County and the developers, plaintiffs would have had a substantial probability of acquiring adequate housing which they could have afforded," 70 F.R.D. 38, 46 (N.D.Ill.1976), and thus found standing. After a hearing, as in this case, the district court concluded that defendants "had in fact knowingly and intelligently engaged in housing practices which were intended to and effectively did exclude persons of low and moderate income and racial minorities from residing in the County,"[21] and that plaintiffs' "inability to secure housing in DuPage County is fairly traceable to the County's actions." See 738 F.2d at 800. Sitting en banc, the court of appeals reversed the district court and found that the plaintiffs had no standing to pursue their claims.
 
 
 36
 Before proceeding to the substance of the standing issue, the County of DuPage court made note of the fact that
 
 
 37
 standing does not necessarily flow from the validity of the plaintiff's contention on the merits, rather the focus is on the plaintiff and whether he or she has alleged and proven facts necessary to meet the minimum constitutional requirements of standing.
 
 
 38
 Id. at 804 (citing Simon, 426 U.S. at 38, 96 S.Ct. at 1924). Thus, regardless of the validity of a claim, there can be no cause of action absent standing to assert that claim. Turning to the standing issue, the court found two main reasons for concluding no standing existed.
 
 
 39
 The plaintiffs' allegations and proof simply do not demonstrate that their alleged injuries " 'fairly can be traced to the (County's) challenged action' " nor that such injuries are " 'likely to be redressed by a favorable decision,' " both of which are necessary to standing.
 
 
 40
 Id. at 811 (citations omitted).
 
 
 41
 As was recognized by the Supreme Court in Warth, and reiterated by the Seventh Circuit in County of DuPage, "the availability of low and moderate income housing depends not only on zoning practices but also 'on the efforts and willingness of third parties to build low and moderate cost housing.' " Id. It was also pointed out in County of DuPage, as in Warth, that plaintiffs pointed to no specific housing projects in which they personally intended to, or could afford to, live. There was no evidence in either case that the County (or City) officials ever specifically discriminated against individual plaintiffs by denying them an opportunity to live in a particular house or project despite general allegations of exclusionary and discriminatory conduct and practices against racial minorities and low income persons.
 
 
 42
 We believe that the situation here involving the claims of plaintiffs Jaimes, Gonzales, Tarrie, and Turner is comparable to that of the plaintiffs in Warth and in County of DuPage. The plaintiffs in County of DuPage also attempted in a class action complaint to establish standing under the thirteenth and fourteenth amendments, the Civil Rights Act, and Title VI, while in Warth the plaintiffs attempted the same under the first, ninth and fourteenth amendments and the Civil Rights Act. In both cases the plaintiffs claimed discrimination with respect to being prevented from obtaining desired housing in suburban locations outside congested large cities. Plaintiffs here encounter the same problems in regard to standing as experienced by those plaintiffs.
 
 
 43
 The first step in any standing analysis is to isolate the asserted "injury in fact." For our purposes, however, we will assume that injury, in whatever form, does exist and proceed to address the causation and redressability issues.[22]
 
 
 44
 It is conceded that for defendants to obtain and lease public housing units in a given incorporated area of Lucas County, they must obtain necessary approval by the local town or city. Even if it were taken as true that defendants "failed to seek" such approval, it is still a matter of speculation and conjecture as to whether these third party, non-defendant governments would grant approval for construction of units that plaintiffs could afford, qualify for, or be eligible to obtain.[23] Plaintiffs have pointed to no specific proposed project, location or site that might have been approved in Sylvania or in Maumee.[24] There is no constitutional right of "access to dwellings of a particular quality," nor is the "assurance of adequate housing" a constitutional mandate. Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972). Neither the type of low-rent public housing legislation here involved nor the constitution requires that a local government accept aid for and approve public housing in a particular location. James v. Valtierra, 402 U.S. 137, 140, 91 S.Ct. 1331, 1333, 28 L.Ed.2d 678 (1971); Housing Authority of Seattle v. Washington Dept. of Revenue, 629 F.2d 1307, 1309 (9th Cir.1980).
 
 
 45
 In analyzing the showing of standing to be made by plaintiffs in this type of claim, courts have looked to a particular project or housing site which may have been affected by particular actions or failures to act on the part of government entities or officials. Frustration in bringing a designated housing unit into being for the benefit of a racial minority or a discrete class of poor persons, or discriminatory acts excluding poor persons of a minority race or nationality from a specified housing project or area may be the basis of standing in a complaint of this kind if it is an indication of a particularized direct injury to the plaintiff. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In Arlington Heights, the Court, in a situation differing from Warth, found that a plaintiff who sought to build or live in racially integrated low-income housing on a particular parcel of land had standing, because
 
 
 46
 [h]is is not a generalized grievance. Instead, as we suggested in Warth ..., it focuses on a particular project and is not dependent upon speculation about the possible actions of third parties not before the court.
 
 
 47
 429 U.S. at 264, 97 S.Ct. at 563 (emphasis added).
 
 
 48
 There is no "particular project" in Sylvania or Maumee (or in Lucas County for that matter) pointed out by plaintiffs, who only indicate a general desire to live in public housing in these communities. Accomplishment of this general desire is subject to "speculative" or "possible" actions of authorities in those particular locales, which are not defendants before the court.
 
 
 49
 In County of DuPage it was alleged that the County and its Board affirmatively discouraged private developers from building housing. The court found that this alleged wrongful conduct did not "cause" the plaintiffs' injury for purposes of Article III. No specific exclusion of any plaintiff could be shown. Likewise, in the present case, no specific project or act of exclusion can be demonstrated.[25] All that is alleged is that LMHA has failed to urge authorities in certain localities here to allow public housing in these areas.
 
 
 50
 Separate and apart from the failure to demonstrate a fairly traceable causal connection between the alleged injury and challenged conduct, plaintiffs also fail to show that assuming the relief they request is granted there is a substantial probability that they will be able to move to the suburbs. See Duke Power, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595; Arlington Heights, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450; Simon, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450. In Warth, the Court stated:
 
 
 51
 We hold only that a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention.
 
 
 52
 422 U.S. at 508, 95 S.Ct. at 2210 (footnote omitted).
 
 
 53
 There is no attempted showing or allegation in this case that if the court grants plaintiffs' requested relief, they will benefit in a "tangible way." Assuming this court ordered LMHA to take affirmative action and apply to Sylvania and to Maumee for permission to build housing, there is no reason to expect that construction of public housing has a substantial probability of ever taking place in either of these areas. Such municipalities are not required to provide low-rent housing for its residents, nor certainly to non-residents on the basis of a generalized complaint of a lack of low-rent or low-income housing. Ybarra v. Town of Los Altos Hills, 503 F.2d 250, 253 (9th Cir.1974). To build in the suburbs, LMHA must obtain cooperation agreements from the various local governments. These have not been obtained in the past, and may not be obtained in the future. There is no allegation or indication that these local governments wish to have low income housing projects placed in their municipalities.[26] Again, these suburban governments are "third parties" not before the court. See Warth, 422 U.S. at 504, 95 S.Ct. at 2208.
 
 
 54
 Besides the speculative nature of availability of cooperation agreements, other contingencies also exist which affect the standing of plaintiffs. Funds must be available to build the public housing projects; specific sites must be located and approved within the suburbs to meet zoning requirements; and finally, for any named plaintiffs personally to benefit in a tangible way, he or she must be found eligible for the project. There is no substantial probability demonstrated that all these contingencies will be met in this case. See Evans v. Lynn, 537 F.2d 571 (2d Cir.1975) (en banc), cert. denied, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977); Topic v. Circle Realty Co., 532 F.2d 1273 (9th Cir.), cert. denied, 429 U.S. 859, 97 S.Ct. 160, 50 L.Ed.2d 137 (1976).
 
 
 55
 Plaintiffs, in their supplemental brief dealing with the question of standing, attempt to distinguish County of DuPage and Allen v. Wright, and characterize them "as little more than reapplications of Warth v. Seldin...." If, then, Warth is applicable to the factual setting of this case, its reapplication is controlling, for its continuing validity has concededly been reinforced in these other later decisions, even where the alleged discriminatory practices were more pervasive.
 
 
 56
 Plaintiffs cite NAACP, Boston Chapter v. Harris, 607 F.2d 514 (1st Cir.1979), in support of their contention that standing exists. This case, however, involved detailed housing projects in Boston or the Boston area sought to be financed by HUD. The court held that minority plaintiffs who were concerned about racial segregation and its effects in Boston area public housing, who desired dispersion of housing units into non-minority housing projects, already approved for funding, were in fact operated in a non-discriminatory fashion. Furthermore, Harris decided that plaintiffs had only a limited and preliminary standing (akin to standing on the issues raised as to segregated units being operated in Toledo, see infra p. 1101) and that the question of standing might further be definitively determined after considering proof and evidence. See also City of Hartford v. Glastonbury, 561 F.2d 1032, 1048 (2d Cir.1976). Gautreaux v. Chicago Housing Authority, 503 F.2d 930 (7th Cir.1974), aff'd sub nom. Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976), also cited by plaintiffs, involved approval of a remedy for desegregating public housing in Chicago by providing for various alternatives in a " 'comprehensive plan' ... including, if the parties deem it necessary or appropriate to provide full relief, alternatives which are not confined to the geographic boundary of the City of Chicago." 503 F.2d 939.[27] The Supreme Court affirmed the authority of the district court to consider remedial action outside the city limits of Chicago, stating:
 
 
 57
 An order directing HUD to use its discretion under the various federal housing programs to foster projects located in white areas of the Chicago housing market would be consistent with and supportive of well-established federal housing policy.
 
 
 58
 * * *
 
 
 59
 * * *
 
 
 60
 An order directed solely to HUD would not force unwilling localities to apply for assistance under the programs but would merely reinforce the regulations guiding HUD's determination of which the locally authorized projects to assist with federal funds.
 
 
 61
 425 U.S. at 301, 303, 96 S.Ct. at 1548, 1549 (footnote omitted).
 
 
 62
 It should be noted that Gautreaux emphasized the effect of its decision by concluding:
 
 
 63
 The remedial decree would neither force suburban governments to submit public housing proposals to HUD nor displace the rights and powers accorded local government entities under federal or state housing statutes or existing land-use laws.
 
 
 64
 425 U.S. at 306, 96 S.Ct. at 1550. Standing was found as to those plaintiffs who were tenants and would-be-tenants of the Chicago Housing Authority, who challenged its practices causing segregation and the substantial underrepresentation of blacks in that system. That case is thus not inconsistent with our holding today.
 
 
 65
 We recognize that Warth and County of DuPage involved neither a claim under Title VIII nor under the Housing Act. Here, HUD and its officials are sued under the Housing Act because HUD is alleged to be "the principal source of financial assistance for such [low-income] housing." The Housing Act, however, adds nothing more to the substance of plaintiffs' claims. There is, then, no legal significance in the fact that the Housing Act was not involved in Warth and County of DuPage.
 
 
 66
 The amended complaint asserts the Title VIII claim as follows:
 
 
 67
 33. Under Title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3601, et seq., Title VI of the 1964 Civil Rights Act, 42 U.S.C. 2000d, Executive Order 11063, HUD is required to ensure that its housing and urban development programs provide minorities with the full enjoyment of equal housing opportunities. HUD has failed to ensure that its programs are administered in an affirmative manner to achieve equal housing opportunities.
 
 
 68
 34. In October, 1973, in response to an administrative complaint filed by individuals and various neighborhood organizations in the City of Toledo, officials in the HUD Columbus Area Office determined, inter alia, that the Toledo Metropolitan Housing Authority should be seeking cooperation agreements from the local governing bodies within its jurisdiction.
 
 
 69
 (Emphasis added). The claim under Title VIII, then, is tied in with the Title VI claim and is similar to the cause of action asserted in County of DuPage. It is directly related to the acknowledgement by plaintiffs that cooperation agreements were required to be obtained from local governing bodies or private third parties before any low-income public housing units or assistance could be built or utilized in communities outside Toledo. Neither the Title VIII claim nor the Title VI claim significantly adds anything of substance to the complaint. The reasons for denial of standing under the constitutional claims and the Civil Rights Act, as exemplified in Warth and County of DuPage, accordingly apply equally to the claims here under Title VI, Title VIII, and the Housing Act.
 
 
 70
 Other cases noted by plaintiffs in their supplemental brief on standing involve specific projects or sites rejected for racial reasons. No third persons who had the authority to act and yet who were not before the court were involved in those cases.[28] These cases, then, are distinguishable from the situation here insofar as plaintiffs generally seek low-rent public housing to be afforded them in the Toledo suburbs, particularly Sylvania and Maumee.
 
 
 71
 With respect to Section 8 Existing Housing, the situation differs to a certain extent. Under this housing program, prospective tenants seek out willing landlords, and assuming the tenant qualifies, HUD subsidizes the tenant by paying a fixed portion of the rent. Thus, no new construction is required and no cooperation agreements need be obtained.[29] However, although there is no need for cooperation agreements, willing landlords, third-parties not before the court, must be located and their consent given to the project. What has been set out before as to public housing projects generally therefore applies to Section 8 Existing Housing in this regard. City of Hartford v. Glastonbury, 561 F.2d 1032 (2d Cir.1976) (en banc), cert. denied, 434 U.S. 1034, 98 S.Ct. 766, 54 L.Ed.2d 781 (1978). There is also no indication here of specific projects or sites available under Section 8, outside the City of Toledo, which were refused or rejected by any named defendants.[30]
 
 
 72
 In spite of this, we find ourselves unable to rule conclusively that plaintiffs lack standing to challenge the Section 8 Existing Housing program. Plaintiffs challenge directly the actions of HUD in setting rentals too low to foster adequate housing outside Toledo. To the extent that this may require relief directed solely against HUD or LMHA, standing may exist. See, e.g., Davis v. Mansfield Metropolitan Housing Authority, 751 F.2d 180 (6th Cir.1984).[31] We hold only that insofar as plaintiffs attempt in some way to force Section 8 Existing Housing upon third parties not before this court, there is no standing.
 
 
 73
 We conclude that no plaintiff has established standing with respect to constitutional claims under the fifth, thirteenth and fourteenth amendments, nor with respect to statutory claims under the Civil Rights Act, Title VI, Title VIII, and the Housing Act, as far as those allegations relate to plaintiffs' expressed desire to move to, or live in, a particular suburb of Toledo. Plaintiffs have each failed to demonstrate a personal, particularized injury inflicted by these particular defendants in respect to these claims. They have each failed to establish a substantial probability that but for defendants' alleged constitutional and/or statutory infractions (or actual failures and omissions to act to bring about the kind of affirmative relief sought) they would have been able to obtain low-rent public housing with defendants' assistance in the areas specified outside Toledo. To put it another way, even if LMHA and/or HUD were ordered to seek to obtain cooperation agreements from municipalities surrounding Toledo, the relief requested, there is no substantial probability that plaintiffs would be successful in obtaining housing in those municipalities. We therefore dismiss these claims for lack of standing.
 
 
 74
 On the contrary, as to the constitutional and statutory claims against defendants for allegedly bringing about segregation of the existing LMHA public housing projects in Toledo and nearby Toledo in Lucas County, plaintiffs have standing to pursue these claims. See Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792; Harris, 607 F.2d 514.
 
 
 75
 In sum, plaintiffs lack standing on all claims against defendants except that claim that "[d]efendants violated plaintiffs constitutional and statutory rights by their policies and practices which caused and perpetuated the internal racial segregation of LMHA housing projects and their location ... in areas of racial concentration." Also, the claim under the Section 8 Existing Housing program, to the extent it does not involve third parties not before the court, should not be dismissed for lack of standing.
 
 B. HOLDING OF THE TRIAL COURT
 
 76
 The trial court found that "intentional racial discrimination over a long period of time ... has played ... a significant role in the concentration of minority persons in limited sections of Toledo and Lucas County ... [and] that positive steps must be taken to alter existing patterns of racial segregation."[32] It was this background finding that influenced the court's discussion about the allegedly segregated housing projects operated by defendants as a consequence of what he called "a device known as 'freedom of choice.' " The trial court described the three refusal policy of LMHA, which offers a prospective tenant at the top of the waiting list[33] a choice as to whether or not to accept the next "available unit" of public housing, as "racism," since "freedom of choice" was a "euphanism" for "racism."
 
 
 77
 The trial court found that defendants placed housing projects for the elderly in "substantially all white census tracts" in order to maintain discrimination, and that "HUD did not set rents high enough to obtain property in non-minority tracts" with respect to leased housing developments. It is difficult to follow the court's discussion of discrimination against the "poor," yet the court faults HUD and holds it responsible, together with LMHA, for not setting higher Section 8 Existing Housing rental rates for which plaintiffs may not even qualify. The court held that defendants discriminated against the poor[34] because
 
 
 78
 If all are to be treated equally, the plaintiffs are entitled to do what the majority does--move to the suburbs.
 
 
 79
 The district court held further that defendants' "failure to do what the law requires is tantamount to willful discrimination." The court found defendants' failure to disturb the status quo over a long period of years deprived the members of the plaintiff class of their rights under the Constitution and laws to "safe, sanitary and decent housing." But, as previously noted, the Constitution does not require that defendants (or others) provide any particular quality housing, nor even "adequate housing," for plaintiffs or the class whom they purport to represent. Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36. Title VIII sets out "a policy ... to provide, within constitutional limitations, for fair housing...." 42 U.S.C. Sec. 3601 (emphasis added). That language has consistently been interpreted as meaning a policy to bar discriminatory practices in housing, and should be read together with 42 U.S.C. Sec. 1982. See Hunter v. Erickson, 393 U.S. 385, 388, 89 S.Ct. 557, 559, 21 L.Ed.2d 616 (1969); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Dillon v. AFBIC Development Corp., 597 F.2d 556 (5th Cir.1979); United States v. Hunter, 459 F.2d 205, 214 (4th Cir.1972), cert. denied, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972), reh'g denied, 413 U.S. 923, 93 S.Ct. 3046, 37 L.Ed.2d 1045 (1973); United States v. Youritan Const. Co., 370 F.Supp. 643 (N.D.Cal.1973), aff'd in part, 509 F.2d 623 (9th Cir.1975); Garrett v. City of Hamtramck, 503 F.2d 1236, 1247 (6th Cir.1974); see also 42 U.S.C. Secs. 3604-3606. Plaintiffs have no constitutional right to be furnished "safe sanitary and decent housing" by defendants; they are constitutionally and by statute entitled to be free of any impediment or conduct on the part of defendants for discriminatory reasons to deny them "fair" housing otherwise reasonably available to those in the same position. Mahaley v. Cuyahoga Metropolitan Housing Authority, 500 F.2d 1087 (6th Cir.1974), cert. denied, 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 805 (1975); Citizens Committee For Faraday Wood v. Lindsay, 507 F.2d 1065 (2d Cir.1974), cert. denied, 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975).[35]
 
 
 80
 The district court also held that "to discriminate against the poor, regardless of race, is abhorrent to the constitutional requirement of equal protection," citing the dissenting opinion in James v. Valtierra, 402 U.S. at 145, 91 S.Ct. at 1335, and concluded:
 
 
 81
 The evidence in the case, taken as a whole, leaves no doubt that the needs of the members of the plaintiff class for decent, safe, and sanitary housing can only be met by developing such housing in the municipalities in Lucas County outside the City of Toledo, and that the defendants, individually and collectively, have failed and refused to take actions that could eliminate the old pattern of discrimination.
 
 
 82
 The district court, regardless of our discussion concerning the issue of standing with respect to the asserted right to require defendants to provide housing "in the municipalities in Lucas County outside the City of Toledo," was in error in concluding that defendants had violated any constitutional right of plaintiffs as low-income or poor persons to "decent, safe and sanitary housing," as he characterized and treated their assertions in this case. He erred also in holding that plaintiffs as "poor" persons, "regardless of race" were entitled to equal rights with the "majority" ("white people with money") to move to the suburbs. Boyd v. LeFrak Organization, 509 F.2d 1110 (2d Cir.), reh'g denied, 517 F.2d 918 (2d Cir.), cert. denied, 423 U.S. 896, 96 S.Ct. 197, 46 L.Ed.2d 129 (1975) (Supreme Court has consistently held that poverty without more is not a suspect classification); Woe v. Cuomo, 729 F.2d 96, 103 (2d Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984) ("at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages"); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 24, 93 S.Ct. 1278, 1291, 36 L.Ed.2d 16 (1973) ("This Court has never heretofore held that wealth discrimination alone provides an adequate basis for invoking strict scrutiny ...").
 
 
 83
 Even if plaintiffs were held to have standing in respect to their claims that defendants prevented their obtaining "fair" housing opportunities in the suburbs (or in Toledo itself), the trial court apparently failed to consider these issues under proper constitutional standards. See Lindsey v. Normet; James v. Valtierra; Acevedo, 500 F.2d at 1082 ("Fair Housing Act does not impose any duty upon a governmental body to plan for, approve and promote any housing"); Lindsay, 507 F.2d at 1068 ("while race has long been recognized as a suspect classification low-income status has not been so recognized"); Jones v. Alfred H. Mayer Co., 392 U.S. at 443, 88 S.Ct. at 2205 (Congress may assure "that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a White man ... the freedom to buy whatever a white man can buy ... in respect to acquisition of housing and property without discrimination"); Ybarra, 503 F.2d at 253 ("we agree that discrimination against the poor does not become discrimination against a minority because there is a statistical correlation between poverty and ethnic background").
 
 
 84
 The policy underlying the Housing Act is to enable the federal government "to assist the States and their political subdivisions ... by improving housing conditions." 42 U.S.C. Sec. 1437; see City of Cleveland v. United States, 323 U.S. 329, 333, 65 S.Ct. 280, 282, 89 L.Ed. 274 (1945). The purpose is not to impose an obligation to place low-income housing in a municipality absent its consent. See James; Ybarra. Thus, even apart from standing, to the extent the district court held that plaintiffs, as poor persons, had a constitutional or statutory right to live in a particular location without the consent of the owner and/or the municipality involved, it was in error. We cannot, furthermore, discern whether the district court came to its judgment that there was intentional racial discrimination because of a perceived "failure to disturb the status quo," or because of its conclusion that discrimination against the poor, including a preponderance of blacks or other minorities in that classification, was unconstitutional or illegal.
 
 
 85
 Here plaintiffs contended that LMHA and HUD, and their responsible officials, did not carry out their affirmative obligations in a manner to prevent or eliminate discriminatory housing practices under Title VI, Title VIII, and the Housing Act. See 42 U.S.C. Secs. 3608(d) and 3617. The charges are similar to those made against HUD and local officials in Anderson v. City of Alpharetta, 737 F.2d 1530, 1532, 1533 (11th Cir.1984):
 
 
 86
 The plaintiffs contend that the federal defendants failed to carry out their responsibilities under these sections, arguing that although they knew or should have known that public officials in north Fulton County had a history of excluding public housing on racial grounds, HUD took no action to counter the deliberate foot-dragging of local governments. Because of these alleged past sins of omission, the plaintiffs seek declaratory and injunctive relief requiring HUD to "take all necessary, appropriate and effective actions, including the provision of the first available funds and technical assistance, to insure the development of public housing" in the areas in question.
 
 
 87
 * * *
 
 
 88
 * * *
 
 
 89
 As we have seen, plaintiffs essentially allege that the federal defendants did not do what they ostensibly ought to have done under sections 3608(a)(3) and (5). Specifically, the plaintiffs contend that HUD should have pressured the County Commission into supplying the commitment letter for the Hopewell Road site in a reasonable time, or alternatively should have either waived its commitment letter requirement or authorized the Housing Authority to take legal action to obtain the commitment letter. The plaintiffs also suggest that HUD should have allowed the Housing Authority to exercise condemnation powers to secure the necessary sites, and they denounce HUD for agreeing to the Housing Authority's subsequent amendment changing the nature of the proposal to a mix of family units and housing for the elderly.
 
 
 90
 These contentions made by plaintiffs in Alpharetta, similar to those asserted in this case, were held not to be within the scope of the Housing Act:
 
 
 91
 This is a potentially sweeping reinterpretation of the nature of the affirmative duty imposed upon HUD by the Fair Housing Act, and we conclude that it has no support either in the terms of the statute, the statutory history, or the applicable case law.
 
 
 92
 * * *
 
 
 93
 * * *
 
 
 94
 There is a vast difference, however, between requiring HUD's officials to include a particular consideration in their decision-making calculus, and suggesting that a federal agency has an affirmative legal duty to correct injustice wherever it exists. The latter interpretation of HUD's mission under section 3608(d) goes far beyond the concerns that Senator Brooks expressed about misguided bureaucratic decision-making, and it is unsupported by the language of the statute itself. Section 3608(d)(3) simply requires HUD to supply "technical" assistance to other agencies or organizations that are concerned with the problem of fair housing, while section 3608(d)(5) appears to pertain only to the "programs and activities" which HUD itself is directly responsible for administering. In addition, the statute provides HUD with few weapons to employ against wrongdoers. The Secretary is clearly empowered to "withhold funds or defer action in the name of desegregation," 114 Cong.Record 2527-28 (1968), and Title VIII admittedly places fewer administrative and statutory constraints upon his ability to revoke funding than apply under Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d-1.
 
 
 95
 737 F.2d at 1534, 1535. Alpharetta is cited to demonstrate our uncertainty about the court's holding HUD and its officials liable for damages and other relief absent a direct relationship being established with respect to demonstrated racially discriminatory conduct and motivation on its part, rather than its perceived inaction and/or refusal to disturb the status quo.
 
 
 96
 Furthermore, the trial court here took no account whatever of defendants' attempts within Toledo to locate public housing units in non-minority areas which were frustrated after extensive court proceedings, which did not involve dilatory or discriminatory conduct or unconcern on the part of defendants.[36] One of these cases was Skillken, a case instituted by plaintiffs' attorneys in May 1974, and decided adversely to them after finally going to the Supreme Court in 1976. The trial court's findings and conclusions relative to racial discrimination in Skillken were rejected by this court.
 
 
 97
 This court noted in Skillken that location of low-rent public housing sites required, under a cooperation agreement, consent of the City of Toledo until 1968. 528 F.2d at 871; see also Davis v. City of Toledo, 54 F.R.D. 386 (N.D.Ohio 1970) (decision of same trial judge acknowledging that location of such projects required submission of sites and plans to the Toledo planning commission). Skillken involved three public housing (turnkey) projects in which rezoning was requested for 145 public housing units. The action of the City in 1974 denying these applications was ultimately approved by this court despite the actions of LMHA seeking the public housing involved. In that case this court observed that in 1970 twenty-one per cent of the households in Toledo eligible for public housing were black and that fifteen per cent of the population was black or other minority, and that "black families are living in virtually all parts of Toledo." 528 F.2d at 879.
 
 
 98
 The trial court in the instant case noted that slightly over fourteen per cent of Lucas County was comprised of black or hispanic minority persons and found that 55 of 128 census tracts in Lucas County had more than "22.6 percent black residents, more than 10 percent residents of hispanic origin, or both." The court concluded that Toledo was a "racially segregated city with minority groups heavily concentrated in limited sections of the City ...," using the same data upon which this court in 1975 and in 1977 relied upon in finding Toledo not to be segregated. Finally, the trial court inferred from this data that "intentional racial discrimination" played a significant role in this "concentration of minority persons" in Toledo and Lucas County.
 
 
 99
 There are also difficulties inherent in the district court's decision concerning the location of housing units in Toledo, particularly in light of the litigation which has delayed or brought about termination of some proposed public housing sites. There were seven projects located in Toledo before 1953, which were ordered to be desegregated at that time pursuant to the TMHA policy adopted earlier that year. See Vann, 113 F.Supp. 210. By the time of trial in this case twenty additional projects had been constructed, fourteen of which were located outside Black Impacted areas. (Three had been so located by 1953). Eight of the projects in areas of racial minority concentration, including the unit in which plaintiff Tarrie resides, were developed under Urban Renewal plans to improve slum areas of the city.[37] This was an effort to provide sanitary and decent housing under the Housing Act to persons in the minority impacted area who needed this assistance by reason of living in substandard slum dwellings. The district court also ignored in its decision the location by defendants of approximately one-half of Section 23 public housing program units outside Minority Concentrated areas.[38]
 
 
 100
 In light of the problems noted concerning the reasoning of the district court, and in light of that court's failure to consider or discuss our contrary findings in Skillken,[39] we must remand the case for further consideration and findings consistent with this court's discussion and determination of the issues. Also, we must consider the damage awards in this case in light of our previous discussion.
 
 C. DAMAGE AWARDS
 
 101
 The trial court, without any discussion of the sovereign immunity issue involving HUD and its officials,[40] held that three plaintiffs (and presumably others in the broad class certified) could recover compensatory and punitive damages, jointly and severally, against all defendants. The compensatory damages were for "economic losses," and for "humiliation, pain and anguish," which the district judge "presumed" for the wrongful deprivations involved. Punitive damages were awarded, although it was "difficult to find any personal malice against the plaintiffs or their class," because the defendants' conduct was "wilful." We will discuss each of the plaintiffs awarded damages in turn.
 
 1. JAIMES
 
 102
 The amended complaint asserts that Jaimes now resides in Toledo, having resided for many years in Sylvania, a suburb of Toledo, in inadequate housing, and that defendants' failure to provide her decent, safe and sanitary housing was the basis for her claim. As before pointed out, Jaimes has no standing to assert claims for defendants' failure to provide her housing in Sylvania. She may have a claim, if proven, provided she could show that being kept on a waiting list for public housing by LMHA in Toledo or somewhere else in Lucas County where public housing units are available violated her constitutional or statutory rights. (It is conceded that more than one-half of the units operated by LMHA were occupied by black and other minority tenants whereas the population as a whole of the area served by LMHA consisted of less than 15 percent black or minority persons). There is no basis established by the trial court for its finding that Jaimes was entitled to $7,200 compensatory and $14,400 punitive damages for having to wait for a place in the public housing units or other low-income housing provided directly or indirectly by LMHA with the assistance of HUD. This award must therefore be set aside. Whether Jaimes suffered damages for having to wait for housing assistance by reason of alleged intentional discriminatory actions of any defendant remains for specific determination on remand.
 
 2. GONZALES
 
 103
 Like Jaimes, Gonzales desires to be afforded low income or public housing in Sylvania, and is on the LMHA waiting list for assistance. What has been said in the case of Jaimes applies also to Gonzales, who received a similar damage award. In their brief, Jaimes and Gonzales base their awards for damages upon "defendants' racially discriminatory site selection actions." A claim may be sustained only if the alleged site selection actions of defendants, in view of the standing rationale herein set out, can be shown to have been intentionally discriminatory and directly related to the deprivation of either constitutional or statutory entitlements. Jaimes and Gonzales may claim damages only if defendants' illegal actions directly and proximately denied them public or low-income housing available following their applications for it.
 
 3. TARRIE
 
 104
 Tarrie complained about residing in a "predominantly black LMHA public housing development ... in a racially concentrated area of Toledo." She argues that defendants would "not permit her to transfer to a unit in an unimpacted area." The trial court found that she requested transfers "to a larger apartment [larger than the three bedroom unit she and her family have occupied] outside the impacted area." There is no analysis by the court concerning the $18,000 award rendered to Tarrie as to whether her ADC monthly income of $409 since 1975 would support a move to a larger apartment or whether such an apartment was available to her in another area beside the one in which she lived; or whether the so-called "three refusal" policy condemned by the district court was a proximate cause of any damage allegedly suffered by Tarrie. There is also no discussion as to whether a transfer policy based on seniority, if one had been adopted, would have entitled Tarrie to effect a transfer to another desired location for which she was eligible and could afford.[41] She was evidently found ineligible for a transfer on the basis of health or economic reasons. The award to Tarrie, under the circumstances, must be set aside and the matter remanded for the opportunity to develop relevant findings in respect to Tarrie's claim and proximate damages suffered, if any, by reason of any defendant's intentional illegal or unconstitutional actions. There was an indication by the trial court of economic losses suffered by Tarrie attributable to the actions of defendants. We are left to speculate as to the basis of the award to Tarrie under the circumstances, and we therefore set aside the damage award against all defendants and remand this aspect of the controversy for further consideration in light of our disposition of all the issues.
 
 
 105
 We do note, however, that no case cited by plaintiffs, and no authority cited by the district court, supports a damage award against a municipal housing authority or HUD, or their agents, for a failure to locate units in an area where no cooperation agreement had been obtained, and where no designated project was involved which was rejected for racial reasons by a local housing authority and/or HUD.[42]
 
 D. AFFIRMATIVE AND INJUNCTIVE RELIEF
 
 106
 We have indicated that a remand is necessary in this case with respect to the damage awards. The court's finding as a basis for both damage awards and the award of other relief are in conflict with this court's findings and conclusions in the earlier Skillken case, and the district court made no effort to explain the basis for the divergence. We, nevertheless, conclude that the injunctive relief ordered in paragraph a. of part VI of the district court's judgment order[43] is appropriate, and we affirm the court to this extent; except that the term "poverty" is to be eliminated. We conclude that the relief ordered in paragraph b. of part VI of said order, however, is too broad in proscribing the taking of steps to provide subsidized low-income housing "in any area which ... soon may be racially impacted." See supra p. 1092. There is no adequate standard upon which to judge whether a site selected for decent, safe and sanitary housing may "soon be racially impacted;" it involves a prescience and foreknowledge based on factors beyond the defendants' control which is inappropriate in the context of an injunctive command. Upon remand, the trial court may, consistent with our discussion of standing, consider further whether an injunction of the nature set out in paragraph b. of part VI is appropriately limited to specific areas (such as census tracts, wards or other definite geographic sections) which are racially impacted. (Reference to the 1980 census data may be appropriate.)
 
 
 107
 We also find that the injunction directive set out in paragraphs c. and d. of part VI of said judgment order is too far reaching in light of our finding of error by the district judge in a number of respects in regard to public housing in municipalities outside Toledo. Upon remand, the district court may, however, find it appropriate to mandate affirmative action by defendants in regard to using reasonable and appropriate means to seek cooperation agreements from municipalities which have not previously entered into such agreements.[44] We reverse, therefore, the injunctive provisions as presently ordered in paragraphs b., c., and d. of part VI, see supra pp. 1091 - 1092, and remand these actions for further consideration and specificity in conformity with this opinion.
 
 
 108
 The district court found that the "originally segregated" housing projects of LMHA "have remained essentially as they were to begin with," and he concluded that "it is inconceivable that after some twenty-five years the racial complexion of LMHA's old housing projects would not at least be the same as that of the list of housing applicants, if not of the community as a whole." We cannot tell from this language what would be deemed to be an acceptable measure of desegregation to the trial court. Would the 65 percent proportion of minority members on the waiting lists be the applicable (or maximum) measure or goal for attainment, or would the 15 percent minority ratio of Lucas County be the applicable (or minimal) measure or goal; or would the goal for each project for the elderly be the 40 percent overall ratio of minority elderly tenants or the 70 percent overall ratio of LMHA's family tenants for the family projects? We believe the district court must clarify this uncertainty in respect to the order that defendants prepare a "special plan of affirmative action to reduce the racial segregation within LMHA projects."
 
 
 109
 We find no clear error in the trial court's findings of serious racial imbalance within the LMHA projects, and that this is attributable, at least in part, to past practices of segregation. Thus, those responsible for tenant assignment and transfers may properly be ordered to prepare such an affirmative action plan as directed by the trial court in part IX of his judgment order, which is affirmed, as set out:
 
 
 110
 ORDERED that defendants shall prepare and submit to this Court within sixty (60) days after the entry of this judgment a special plan of affirmative action to reduce the racial segregation within LMHA projects, which shall include, insofar as possible, but not be limited to, the abandonment of the three refusal rule for new applicants, a transfer policy which encourages transfers to create better racial balance, the affirmative marketing of units to applicants where acceptance of the units would create better racial balance, and the earlier housing of applicants of LMHA's waiting list if they are willing to reside in a project which would have a better racial balance if they resided in it....
 
 
 111
 With respect to part VII of the trial court's order, we set this dispersal direction of subsidized low-income housing aside in light of the conclusions which we have previously reached that the trial court must take into account, before ordering any defendant to locate subsidized housing "throughout the territorial jurisdiction of LMHA," the consent of the particular municipality, governmental unit and/or private ownership involved, and the feasibility of such location in light of available financing, zoning, and other pertinent considerations.
 
 IV.
 
 112
 In summary, we find no clear error in the district court's findings or conclusions in relation to impermissible internal segregation within LMHA housing projects. We therefore AFFIRM the order requiring prompt submission of a plan, encompassed within the meaning of the statutes asserted as a basis for this action, see NAACP, Boston Chapter v. Harris, 607 F.2d 514; Gautreaux v. Chicago Housing Authority, 503 F.2d 930, to correct that situation, as set out in part IX and, in substance, paragraph a. of part VI of the trial court's order.
 
 
 113
 We find no standing in respect to the claims for location of desired public or low-income housing in municipalities, not parties before the court, in the absence of particular sites where there has been alleged or demonstrated rejection of low-income subsidized housing or public housing projects for racial or discriminatory reasons.
 
 
 114
 We set aside the damage awards and the court's injunction and direction for submission of affirmative action plans, except for part IX and paragraph a. of part VI of the trial court's judgment order, and REMAND the cause for further proceedings in conformity with this opinion.
 
 
 115
 Each party will bear its or his own costs on this appeal. This direction as to costs, however, is not intended to preclude full and fair consideration by the district court of plaintiffs' petition for allowance of attorneys' fees with respect to hearings before the district court and in respect to this appeal.
 
 
 
 *
 Honorable Julia S. Gibbons, United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 Toledo, Sylvania, Maumee, and Oregon
 
 
 [2]
 Ottawa Hills, Holland, Whitehouse, Waterville, Berkey and Harbor View
 
 
 [3]
 We take judicial notice that the 1980 census did depict some change in this statistical data. In 1980, of the 471,741 inhabitants of Lucas County, approximately 84 percent were white, 14 percent were black, and 3 percent were Mexican-American or other
 
 
 [4]
 We take note, again, that this has not varied materially in the 1980 census report. In 1980, approximately 97 percent of the blacks and 84 percent of the Mexican-Americans lived in the city
 
 
 [5]
 In 1980 this figure was closer to 75 percent
 
 
 [6]
 A census tract is "Black Impacted" if its percentage of blacks exceeds twice the percentage of blacks living in the county. At the same time, a census tract is "Minority Concentrated" if it is either Black Impacted or has three times the percentage of hispanics living in the county
 
 
 [7]
 This de jure segregation was ordered to cease in Vann v. Toledo Metro Housing Authority, 113 F.Supp. 210 (N.D.Ohio 1953), after initial steps had been taken to this effect
 
 
 [8]
 "Out of racial balance" for family units means that instead of there being a 70 percent minority to 30 percent white ratio, minority representation is over 85 percent or under 55 percent in any given project. For elderly units, this means instead of a 40 percent minority to 60 percent white ratio, minority representation is either over 55 percent or under 25 percent
 
 
 [9]
 At one time Section 23 Leased Housing was available. This was abandoned in 1974, with much of this type being converted into Section 8 Housing
 
 
 [10]
 Under the "three refusal program," employed by LMHA, if an applicant does not wish to live in the unit offered, he may reject it and wait for the next available unit. It is only after the third refusal that an applicant is then removed from the top of the waiting list and placed at the bottom
 
 
 [11]
 The agreement is required by statute and must provide the property with tax exempt status and allow for proper services. See 42 U.S.C. Sec. 1437d; 24 C.F.R. Sec. 841.201(c)
 
 
 [12]
 In 1973, HUD's Equal Opportunity Division suggested that a moratorium be placed on further construction in Toledo until LMHA demonstrated " 'sufficient, comparable opportunities' for public housing applicants, including minority applicants, outside the Corridor [i.e., the minority area where most of the projects existed]." The suggested moratorium was not carried into effect
 
 
 [13]
 Plaintiffs also argue that Section 23 Leased Housing and Section 8 Existing Housing are subject to segregation and discrimination. In 1977, there were approximately 550 units leased to LMHA. None of these were located in the suburbs, while 53 percent were located in Minority Concentrated areas. About two-thirds of the family units were located in these areas
 Of the 322 units occupied through Section 8 Housing, 52.8 percent were located in Minority Concentrated areas, while only somewhere between 3 to 15 units were found in the suburbs.
 
 
 [14]
 HUD not only claims the court erred in awarding damages, but also claims to be protected by sovereign immunity
 
 
 [15]
 The issue was raised in the district court, where the court found in favor of standing. 432 F.Supp. 25 (N.D.Ohio 1977). Also, HUD raised the issue orally before this court, though not addressing the issue in its brief
 
 
 [16]
 The Supreme Court has expressly rejected any notion that these last two elements of the standing analysis are one and the same
 The "fairly traceable" and "redressability" components of the constitutional standing inquiry were initially articulated by this Court as "two facets of a single causation requirement." To the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested. Cases ... in which the relief requested goes well beyond the violation of law alleged, illustrate why it is important to keep the inquiries separate if the "redressability" component is to focus on the requested relief.
 Allen v. Wright, 104 S.Ct. at 3326 n. 19 (citation omitted).
 
 
 [17]
 Prudential considerations also are applied to limit standing. For example, a party may be barred from asserting the rights of others, see Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), or may be prevented from prosecuting a "general grievance" common to a large group of people. See Valley Forge, 454 U.S. at 474-75, 102 S.Ct. at 759-60. Also, as a prudential requirement, a party may be required to fall within the "zone of interests" intended to be protected by a given statute. See Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)
 
 
 [18]
 In comparing the present case with Warth and County of DuPage, we exclude at this juncture of our discussion the claim of racial segregation within existing LMHA units
 
 
 [19]
 The former case involved Penfield, New York, a suburb of Rochester; the latter a county area outside metropolitan Chicago
 
 
 [20]
 The Rochester Homebuilders Association, Inc., another plaintiff (in a similar position with the plaintiff in County of DuPage ), claimed "that the town's zoning practices have deprived its members of the opportunity to construct housing for low and middle income persons, thus harming the association's members...." Warth v. Seldin, 495 F.2d 1187, 1190 (2d Cir.1974). Other plaintiffs asserted that several proposals for low income housing had been rejected by defendants. Low income black and Puerto Rican plaintiffs who resided in Rochester claimed to have "sought but failed to obtain housing in Penfield," but without specifying a particular rejection. 495 F.2d at 1191
 
 
 [21]
 The district court found statistical disparities between the black population in unincorporated areas and in the entire county, and that the practices challenged were more pervasive than in Warth
 
 
 [22]
 Plaintiffs assert that they wish to have the "opportunity" to live outside the City of Toledo. The absence of such an "opportunity," however, is not an injury within the constitutional meaning of that word. Such an "injury" is obviously shared by a large class of people, extending well beyond the class certified in this case. "For purposes of standing, ... it is the exclusion itself that is of critical importance, since exclusion alone would violate the asserted rights quite apart from any objective or subjective disadvantage that may flow from it." Warth, 422 U.S. at 503 n. 13, 95 S.Ct. at 2207 n. 13. Therefore, it is not a general absence of opportunity that injures plaintiffs, rather it is the particular exclusion that must form the focus of our analysis. This distinction, for purposes of standing, is important. Exclusion creates a more direct injury than a mere absence of opportunity to relocate somewhere else. Only the former is judicially cognizable as an injury for purposes of standing
 
 
 [23]
 At the hearing, the district judge noted that defendants, at the urging of HUD, had by letter (ineptly in his view) attempted to obtain such approval, but without success
 
 
 [24]
 Plaintiffs Jaimes and Gonzales were living in Toledo at the time of the hearing, but had lived for many years in Sylvania and desired to have affordable public housing there. Plaintiff Turner was living in Toledo at the time of the hearing also, but desired affordable public housing in Maumee
 
 
 [25]
 Appellees do point out in their brief that in 1978 three sites were selected in non-Minority Concentrated areas for proposed construction of public housing. These were subsequently abandoned by LMHA, and are currently the subject of litigation. Arthur v. City of Toledo, No. 78-153 (N.D.Ohio 1978). These units, however, were all to be built in the City of Toledo and not in the suburbs
 
 
 [26]
 Municipalities must make important decisions regarding cooperation agreements. See supra note 11. "[U]nder federal law, a cooperation agreement requires a governing body to provide services and to waive taxes on the project." United States v. Board of School Commissioners of Indianapolis, 637 F.2d 1101, 1126 (7th Cir.) (Tone, J., dissenting), cert. denied, 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980); see also James v. Valtierra, 402 U.S. at 143 n. 4, 91 S.Ct. at 1334 n. 4; Housing Authority of Seattle, 629 F.2d at 1309
 
 
 [27]
 Judge Tone, however, dissented with respect to consideration of "inter-district" relief
 
 
 [28]
 See Dailey v. City of Lawton, 296 F.Supp. 266 (W.D.Okla.1969), aff'd, 425 F.2d 1037 (10th Cir.1970); Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (8th Cir.1972); Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809 (3d Cir.1970); Kennedy Park Homes Association v. City of Lackawanna, 318 F.Supp. 669 (W.D.N.Y.), aff'd, 436 F.2d 108 (2d Cir.1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971)
 
 
 [29]
 Cooperation agreements are not required for Section 8 New Construction Housing where there are eligible and interested developers who seek such projects. See generally 24 C.F.R. Part 880. Because LMHA has not implemented this program and because plaintiffs do not challenge LMHA's decision in this regard, we find it unnecessary to address the significance, if any, of this circumstance. Suffice it to say that even assuming that no cooperation agreements are required, several other contingencies might preclude construction
 
 
 [30]
 Plaintiffs concede that Section 8 prospective tenants "were told to report incidents of discrimination to HUD or LMHA," and that there were few, if any, such complaints. Plaintiffs also concede that LMHA sought willing Section 8 landlords, as could prospective tenants on their own, and that positive results were dependent not only on the willingness of private market landlords, but also on the intensity of the prospective tenant's efforts
 
 
 [31]
 From the record before us we find difficulty in determining whether any of the named plaintiffs attempted to engage in, or would qualify for, the Section 8 Existing Housing program. The absence of such an attempt may cause further difficulties in regard to standing. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Because we find it necessary to remand this case to the district court, we find it unnecessary to discuss further standing in regard to Section 8 Existing Housing. We note only that the relief sought by plaintiffs on remand may affect their standing, as might the absence of attempted participation in the program
 
 
 [32]
 This conclusion is in conflict with the finding of this court in Joseph Skillken and Co. v. City of Toledo, 528 F.2d 867 (6th Cir.1975), vacated and remanded, 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786, upon remand, 558 F.2d 350 (6th Cir.), cert. denied, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977), reh'g denied, 434 U.S. 1051, 98 S.Ct. 904, 54 L.Ed.2d 805 (1978). See United States v. Parma, 661 F.2d 562, 574 (6th Cir.), reh'g denied, 669 F.2d 1100 (6th Cir.1981), cert. denied, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441, reh'g denied, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982), discussed infra note 35. In Skillken, 558 F.2d at 351, this court adhered to its original decision, 528 F.2d 867, found it consistent with Arlington Heights and Hills v. Gautreaux, and held that the evidence in that case did not indicate racial segregation in Toledo. The same trial judge in the instant case had held to the contrary in Skillken and was reversed. It is puzzling that this judge failed even to make reference to Skillken in his memorandum decision in this case
 
 
 [33]
 Plaintiffs contend that "minority applicants make up 65% of LMHA's waiting list."
 
 
 [34]
 The trial court observed that "the discrimination which this action attacks is against poor people." Plaintiffs aver that they are "low-income, minority persons."
 
 
 [35]
 We are mindful in this discussion of this court's opinion in United States v. Parma, 661 F.2d 562, a Housing Act and Title VIII case. Suburban Parma was found to have an unremitting racial hostility to blacks and had only 50 blacks living in that city of over 100,000. The case involved the rejection by Parma of a specific proposal of a federally subsidized multiple-family housing project. The Attorney General was found to have a specific statutory authority and standing to bring the action under the Housing Act since he had "reasonable cause to believe" that racial discrimination was taking place in the official acts of that city. Parma distinguished Skillken on the grounds that the latter "was based on a finding that no racial discrimination was shown to have been involved in the City's refusal to grant a rezoning request and that Toledo was not racially segregated." 661 F.2d at 574. The court distinguished Lindsay and Acevedo v. Nassau County, New York, 500 F.2d 1078 (2d Cir.1974), also on the grounds that the Attorney General of the United States had brought the suit based on an alleged general "pattern and practice of discrimination."
 
 
 [36]
 See LMHA v. Boyle, No. 77-1134 (Ohio 1978); Lovell v. TMHA, No. 73-196 (N.D.Ohio 1974); Skillken. Interestingly, plaintiffs did not mention Skillken in their brief filed with this court, even though plaintiffs' counsel also represented the plaintiffs in that case
 
 
 [37]
 Altogether fourteen of the family and elderly housing projects developed by LMHA, more than half of the total, were developed under Urban Renewal programs
 
 
 [38]
 See supra note 13
 
 
 [39]
 This is not to say that Skillken necessarily precludes a finding of intentional discrimination in the present case. We intimate only that the Skillken findings must be considered in relation to the facts presented here
 
 
 [40]
 There is a substantial question as to whether the "sue and be sued" language of 42 U.S.C. Sec. 1404a, as claimed by plaintiffs entails a general broad waiver of sovereign immunity as to civil rights damage claims under the Civil Rights Act, Title VI or Title VIII, with respect to HUD and its officials. See United States v. Adams, 634 F.2d 1261 (10th Cir.1980); Unimex, Inc. v. United States Dept. of Housing and Urban Development, 594 F.2d 1060 (5th Cir.1979); Penn v. Schlesinger, 490 F.2d 700 (5th Cir.1973), rev'd on other grounds, 497 F.2d 970 (5th Cir.1974) (en banc ), cert. denied sub nom. Penn v. Rumsfeld, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976); Navy, Marshall & Gordon v. United States Int'l Development Coop., 557 F.Supp. 484 (D.D.C.1983). Because we find it necessary to set aside the awards of damages, we decline to resolve the issue of whether HUD can be held liable for damages despite sovereign immunity, in light of this purported waiver
 
 
 [41]
 The trial court found that "the whole area where [Tarrie's apartment] is located is hazardous to her safety and that of her family." If that be so, it can be readily seen that some applicants on the LMHA waiting list would be hesitant to move into her apartment or into the McClinton Nunn Project, and that other tenants in that project might also have desired to move elsewhere. Nowhere does the court indicate that any defendant is responsible for the "hazards" in the area, or that defendants could faisibly control those responsible for the damages there. (It was built on Urban Renewal clearance land and efforts were made to place white families in this project before Tarrie even moved into the apartment in question)
 
 
 [42]
 The following cases cited in the appellees' brief, Phillips v. Hunter Trails Community Ass'n, 685 F.2d 184, 190-91 (7th Cir.1982); Woods-Drake v. Lundy, 667 F.2d 1198, 1203 (5th Cir.1982); Phiffer v. Proud Parrot Motor Hotel, Inc., 648 F.2d 548, 552 (9th Cir.1980); Gore v. Turner, 563 F.2d 159, 163 (5th Cir.1977); Smith v. Anchor Bldg. Corp., 536 F.2d 231, 236 (8th Cir.1976); Fort v. White, 530 F.2d 1113, 1116 (2d Cir.1976); Williams v. Matthews Co., 499 F.2d 819, 829 (8th Cir.), cert. denied, 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); Jeanty v. McKey and Poague, Inc., 496 F.2d 1119, 1121 (7th Cir.1974); Seaton v. Sky Realty Company, Inc., 491 F.2d 634, 636-37 (7th Cir.1974), all involve claims by a member of a racial minority against non-governmental owners or agents of specific private property for a refusal to sell or rent for racial reasons
 
 
 [43]
 Defendants and all other persons acting in concert with them were enjoined by the district court from:
 a. engaging, or continuing to engage, in any acts or practices which have the purpose or effect of denying equal housing opportunities because of poverty, race, color, religion, national origin, or sex; ....
 See supra p. 1091.
 
 
 [44]
 Such an order may stem only from plaintiffs' claim that defendants are causing and perpetuating racial segregation within existing units, and are placing said units in racially concentrated areas. See supra p. 1102. The order, if warranted, would be part and parcel to correcting this problem, but could not be framed so as to breach the established standing principles previously discussed